# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NELSON LORA-PENA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-442-SLR |
| | ) |
| DEPUTY U.S. MARSHAL ROBERT DENNEY, et al., | ) |
| | ) |
| Defendants. | ) |

Nelson Lora-Pena, Northeast Ohio Correctional Facility, Youngstown, Ohio. Pro Se plaintiff.

Lesley F. Wolf, Esquire, Assistant United States Attorney, United States Department of Justice, Wilmington, Delaware. Counsel for defendants.

**MEMORANDUM OPINION**

Dated: January 10, 2011
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiff Nelson Lora-Pena ("plaintiff"), an inmate at the Northeast Ohio Correctional Facility, Youngstown, Ohio, filed this lawsuit alleging violations of his constitutional rights. He proceeds pro se and has paid the filing fee. Before the court is defendants' motion for summary judgment and plaintiff's response thereto. (D.I. 74, 79) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons discussed, the court will grant the motion for summary judgment.

## II. BACKGROUND

On April 9, 2005, plaintiff was arrested at his home by members of the U. S. Marshal Service ("USMS") Fugitive Apprehension Task Force ("FATF"). At the time, plaintiff had been a fugitive for ten years and was the subject of an outstanding arrest warrant for violation of supervised release. *United States v. Lora-Pena*, 227 F. App'x 162-63 (3d Cir. 2007) (not published). Due to the events surrounding his arrest, plaintiff was criminally charged, tried, and convicted of three counts of assault on a federal officer and one count of resisting arrest. Defendants Supervisory Deputy U.S. Marshal Robert Denney ("Denney"), Deputy U.S. Marshal William David ("David"), U.S. Marshal David Thomas ("Thomas"),[1] and Deputy U.S. Marshal Jack Leo ("Leo") testified at the trial.[2] The conviction and sentence were upheld on direct appeal. *Id.* Plaintiff sought,

---

[1] Incorrectly identified in the complaint as "Thomas Davis." (*See* D.I. 75 at n.1) Thomas is no longer the U.S. Marshal.

[2] Also named as defendants are FATF Officers Fletcher ("Fletcher"), Daily ("Daily"), and Bowers ("Bowers"), and State Police Trooper Hahn ("Hahn"). Plaintiff's allegations contain a mix of *Bivens* and 42 U.S.C. § 1983 claims. *Lora-Pena v. F.B.I.*, 529 F.3d 503 n.1 (3d Cir. 2008) (citing *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)). In *Bivens*, the Supreme Court

and was denied, post-conviction relief pursuant to 28 U.S.C. § 2255. *United States v. Lora-Pena*, 375 F. App'x 242 (3d Cir. 2010) (not published).

Plaintiff alleges that at the time of his arrest, Leo used excessive force in violation of his constitutional rights and that the other defendants failed to protect him from Leo's use of force. Plaintiff further alleges violations of his right to due process under the Fifth and Fourteenth Amendments, "including the right to be free from unjustified and excessive force utilized by federal, state, or local police."[3] (D.I. 1 at 6) He seeks compensatory damages.

On the day in question, law enforcement officers arrived at plaintiff's residence to serve an arrest warrant. USMS officers were wearing ballistic vests with a USMS badge on the left shoulder, "police" across the front of the vest, and "police, U.S. Marshal" on the back of the vest. At trial, plaintiff testified that the officers were wearing police vests and, when he saw them, he knew they were law enforcement officers. During his deposition, plaintiff testified that the officers were not wearing vests that

---

recognized a private cause of action to recover damages against a federal agent for violations of constitutional rights. *Id.* When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Therefore, constitutional claims against federal officers are properly brought under *Bivens* and any claims against state officers are § 1983 claims. *Lora-Pena*, 529 F.3d 503 at n.1.

[3]Excessive force claims arising out of an arrest are analyzed under the Fourth Amendment, *Graham v. Connor*, 490 U.S. 386 (1989), excessive force claims for pretrial detainees are analyzed under the Fourteenth Amendment, *Sylvester v. City of Newark*, 120 F. App'x 419, 423 (3d Cir. 2005) (not published), and excessive force claims for those convicted of a crime are analyzed under the Eighth Amendment, *Graham v. Connor*, 490 U.S. at 395 n.10. Plaintiff's claims occurred at the time of his arrest and, therefore, are analyzed under the Fourth Amendment.

identified them as "police" and they did not identify themselves. (D.I. 76, A-88-89, A-166, A-195, A-213, B-38, app 432-33)

Denney and Thomas covered the rear of the residence. David walked to the front door and saw plaintiff inside the hallway directly in front of him. Leo, who was behind David, carried a side arm and a semiautomatic rifle. David testified that he stated, "police, let me see your hands." Plaintiff complied and showed his hands. David ordered plaintiff to come to the door. Again, plaintiff complied but, by the time he reached the front door, two very large pit bulls were at his feet, inches from the interior of the door. The dogs were agitated, barking, growling, snarling, lunging at the door, and banging into it. David drew his weapon and told plaintiff to control the dogs. Plaintiff pushed the door open, turned, and ran to the rear of the house.[4] David yelled that plaintiff was going out the back of the house but, within a few minutes, plaintiff came back into the hallway towards David and into the living room area. (D.I. 76, A-88, A-98-101, A-104-106, A-163-165, A-195, A-212-215, app 440-41)

At trial, plaintiff testified that he saw the officers approach, panicked, ran to the back door and went outside, but U.S. Marshal personnel were there. Plaintiff testified during his deposition that, when he saw Denney and Thomas in the back, he knew they were "the cops." Thomas yelled, "police, freeze, stop." Plaintiff went back in the house. Denney and Thomas did not enter the residence because a pit bull was running towards the rear glass door that Thomas had closed. Plaintiff tried to leave the residence through a window, but retreated when Hahn attempted to grab him. Approximately one

---

[4] David was able to keep the dogs in the house. (D.I. 76, A-103)

minute later Denney saw plaintiff looking through the glass door. Plaintiff raised his hands in a questioning motion and spoke to Denney, who said, "police, come to me," but plaintiff ran away. Denney chased plaintiff down the hallway and attempted to pin plaintiff against a closed bedroom door, but the door opened and Denney stumbled into the room. Thomas entered the house right behind Denney. (D.I. 76, A-107-09, A-167-68, A-170-71, A-173-75, A-196-97, A-204, A-217, B-26, app 433-35)

David had entered the house and the back hallway when he saw a struggle between Denney and plaintiff. Leo entered behind David. Denney was trying to push plaintiff to the floor while Thomas stood in the doorway of a bedroom. At some point, plaintiff was able to get around Denney. David was unable to help Denney because a pit bull lunged at him and forced him into a different room. David looked into the hallway and saw plaintiff running and pushing past Denney and Thomas. The second pit bull had Denney's pant leg in his mouth and Denney kicked the dog away. At that point, the two pit bulls began attacking each other in the hallway and David and Denney were able to contain them in a rear bedroom. Leo, who was standing in the hallway, testified that, when plaintiff broke free from Denney, plaintiff ran right into Leo's chest. Leo is bigger and taller than plaintiff. According to plaintiff, Leo grabbed and tackled him. Plaintiff testified during his deposition that Leo did not identify himself and plaintiff did not think that Leo was a law enforcement officer.[5] (D.I. 76, A-109-111, A-113-15, A-165, A-175-77, A-217, A-219, A-224, B-27, app 438, 442-43)

---

[5] Defendants make reference to the Third Circuit's finding that Leo's trial testimony was more credible than plaintiff's version of the events. (D.I. 75 at 7) While that may be the case in the criminal proceeding, this court may not make credibility assessments at the summary judgment stage in this proceeding.

Leo's rifle was in a lowered ready position across his chest, held by his right hand. Leo was concerned with maintaining control of the weapon and grabbed plaintiff with his left hand in an effort to keep him from fleeing. According to Leo, plaintiff's momentum forced them backwards into the wall causing a sizeable hole in the sheet rock. Plaintiff testified that Leo threw him into the wall. Leo testified that plaintiff was scratching, clawing, punching, digging his nails in his hands and scalp, and grabbing his weapon. According to plaintiff, Leo began hitting him for no reason. Leo and plaintiff remained standing. While they struggled, Leo's right hand was occupied in maintaining control of his weapon and his left hand was occupied in preventing plaintiff from getting away. Leo struck plaintiff in the nose or upper face with his forehead (i.e., a headbutt), very hard, at least twice. Plaintiff did not stop struggling. Leo also struck plaintiff with his elbow, fist, and forearm, but plaintiff continued to struggle. (D.I. 76, A-219-24, B-28, B-41)

They continued struggling from the wall and ended up between the living room and the front hallway area. According to plaintiff, after Leo tackled him, Leo started hitting plaintiff, threw him onto the floor, and kept hitting him. According to Leo, plaintiff pulled at Leo's weapon and clawed at his hands which caused the rifle to fire a round through the front door and into the neighborhood. Plaintiff testified that, while lying on the floor, he heard the gunshot.[6] According to Leo, plaintiff continued to struggle after the weapon discharged. According to plaintiff, Leo was on top of him and continued to punch and kick him after the gun discharged. Plaintiff testified that he never tried to

---

[6]As the dogs were being secured, David and Denney heard a gunshot. (D.I. 76, A-117, A-178)

grab Leo's gun. Leo testified that plaintiff was not struck repeatedly, but only when the two of them were on the floor and plaintiff was grabbing him. Leo testified that when plaintiff began to comply, Leo no longer needed to defend himself and plaintiff was no longer punched. Plaintiff testified that the incident with Leo happened very quickly, and lasted no more than five minutes until he was cuffed. He also testified that no one else was present while he and Leo were struggling. (D.I. 76, A-225-26, A-231, B-13, B-27, B-35, B-41-2, app 452-53, 455-56, 458, 470, 534)

Thomas' first contact with plaintiff occurred in the rear hallway in an attempt to restrain him. At that point, plaintiff continued to struggle with Leo, tried to get away, hit, and flailed his arms. Thomas was concentrating on plaintiff's hands and did not see who was grabbing plaintiff, but he testified that plaintiff was hitting people who were trying to restrain him. Thomas grabbed plaintiff by the knees and plaintiff fell to the ground along with other police officers. At that point, David ran to the hallway and saw Thomas on the floor attempting to gain control of plaintiff's legs. All the officers eventually wound up in the living room. Denney saw Leo and Hahn struggling in the living room and Thomas patting himself to see if he was alright. Leo was on his knees alongside of plaintiff, who was on the floor on his side and face down, attempting to get plaintiff's right hand to cuff him. Plaintiff would not show his hands and David went to the left side of plaintiff and tried to gain control of his left arm that was underneath plaintiff's body. Eventually the officers were able to free plaintiff's hands and cuff him behind his back. According to David, Denney, and Leo, plaintiff was thrashing, turning his body, kicking, attempting to get up, crawl, and fighting so that he would not be taken into custody. (D.I. 76, A-117-121, A-179, A-198-201, A-207, A-231-32)

-6-

Plaintiff testified that when the other officers came in, they tried to help him and tried to get Leo off him, but Leo kept hitting him. Plaintiff relayed that the officers grabbed Leo around his neck and shoulders to pull him off and Thomas said, "Look what you are doing. Look what you did. You're going to get us all in trouble." Plaintiff identified Thomas as pulling Leo off him. He also recalls that Denney was present. While plaintiff testified that Leo did not punch or kick him after Thomas pulled him off, he also testified that Leo continued to hit him after he was handcuffed. Plaintiff continued to struggle after he was handcuffed and, because he continued to struggle, leg irons were placed on him.[7] Plaintiff was subdued and eventually officers placed a waist-chain around him. Other than Leo and Thomas, plaintiff is unable to identify the officers. (D.I. 76, A-118, A-120-121, A-180, A-200, A-207, A-232, B-27, B-30, B-32-33, app 454-58, 461, 488, 511)

Plaintiff sued the unidentified officers because he believes that they should have helped Thomas pull Leo off him. Plaintiff named Thomas as a defendant because he was one of the arresting officers and "could have done something better . . . made it better . . . tactic, procedures." Plaintiff sued Denney because he is a supervisor. Plaintiff testified that he did not strike or threaten any officer. He also testified that Leo was the only individual who punched and kicked him. (D.I. 76, B-27, B-34, app 457, 492-94)

Plaintiff received injuries to his face and the upper portion of his body that included bruising, a broken orbital bone, and contusions. Leo had an abrasion and

---

[7]Thomas had to stand on the back of plaintiff's legs because even after he was handcuffed, he continued to kick. (D.I. 76, A-200)

-7-

small cuts on his hands from plaintiff's fingernails. David was unsure when plaintiff's injuries occurred. Denney testified that the injuries occurred after plaintiff left him in the hallway and before Denney returned to the living room. Thomas saw that plaintiff was injured but did not see how the injuries were inflicted. (D.I. 76, A-129-132, A-180-81, A-209, A-227, A-235)

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56 on the grounds that Leo is entitled to qualified immunity or, in the alternative, that the claims against him should be dismissed pursuant to Heck v. Humphrey, 512 U.S. 477 (1994). In addition, they contend that, because plaintiff cannot prevail on the excessive force claim, he similarly cannot prevail on the failure to protect claim. Alternatively, defendants argue they lack the requisite personal involvement necessary for a civil rights violation, plaintiff cannot identify any defendant who allegedly failed to protect him, and Thomas took action and intervened in Leo's actions.

## III. STANDARD OF REVIEW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come

-8-

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The judge must ask not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Id.* at 252. The court must not engage in the making of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" as these "are jury functions, not those of a judge, [when] [] ruling on a motion for summary judgment." *E.E.O.C. v. GEI Group, Inc.*, 616 F.3d 265, 278 (3d Cir. 2010) (citation omitted).

## IV. DISCUSSION

### A. Federal Tort Claims Act

In addition to the constitutional claims, plaintiff also raised state tort claims under Delaware law. On February 16, 2007, as to the state tort claims, the court substituted the United States of America ("United States") for Denny, Leo, David, Thomas, Fletcher, Daily, Bowers, and Hahn. Plaintiff has since withdrawn the state tort claims and acknowledges that the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, is the exclusive means by which the United States may be held liable in tort. (*See* D.I. 31 at 9) Plaintiff conceded in an earlier response to a motion to dismiss that, due to his failure to exhaust his administrative remedies, he is precluded from bringing the tort claims. (*Id.*) Inasmuch as the court lacks subject matter jurisdiction over the claims, the court will dismiss the tort claims raised against the United States. *See Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 216 n.6 (3d Cir. 1988) (discussing the appropriateness of *sua sponte* dismissal for lack of subject matter jurisdiction when a pro se party has been given an opportunity to be heard).

### B. Qualified Immunity

Defendants argue that Leo is entitled to qualified immunity. Under certain circumstances, government officials are protected from *Bivens* and § 1983 suits by qualified immunity. The doctrine of qualified immunity serves to protect officers from civil liability "when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815 (2009). Accordingly, it gives "ample room for mistaken judgments," *Hunter v. Bryant,* 502 U.S. 224, 229 (1991), whether the official's mistake is a mistake of fact, mistake of law, or mistake based on mixed questions of fact and law,

*Pearson,* 129 S.Ct. at 815. In the context of Fourth Amendment claims, qualified immunity operates to "protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S. 194, 206 (2001) (quoting *Priester v. Riviera Beach,* 208 F.3d 919, 926 (11th Cir. 2000) (internal citation omitted)).

The court makes two inquiries when analyzing qualified immunity. Under the constitutional inquiry, the court examines "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson,* 129 S.Ct. at 816 (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)) (citation omitted). Second, the court inquires "whether the right at issue was 'clearly established' at the time of a defendant's alleged misconduct." *Id.* Courts have the discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson,* 129 S.Ct. at 818.

"[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard. . . ." *Graham v. Connor,* 490 U.S. 386, 395 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *Kopec v. Tate,* 361 F.3d 772, 777 (3d Cir. 2004); *Mosley v. Wilson,* 102 F.3d 85, 95 (3d Cir. 1996). A court must judge the reasonableness of particular force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." *Graham*, 490 U.S. at 396. The reasonableness of an officer's use of force is measured by "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time. *Moore v. Vangelo*, 222 F. App'x 167, 170 (3d Cir. 2007) (not published) (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)).

Plaintiff contends that Leo used excessive physical force during the arrest. Defendants argue that plaintiff's conviction and sentence for assault collaterally estop him from denying that he assaulted Leo, scratched his hand, caused injuries, and caused Leo's rifle to discharge, thus justifying qualified immunity. Defendants further argue that a reasonable officer in Leo's position could have believed that plaintiff was trying to disarm and kill him. Hence, punching and kicking plaintiff were reasonable responses to the assault. Defendants go on to argue that Leo reasonably could have believed that he was fighting for his life and, therefore, could have used deadly force.[8]

Initially the court notes that estoppel relative to plaintiff's conviction for assault and the scratches Leo received does not lead to the automatic conclusion that Leo is

---

[8]The court is unsure why defendants present this argument inasmuch as the evidence of record does not indicate Leo used deadly force.

entitled to qualified immunity. As noted by the Third Circuit, a conviction for resisting arrest does not necessarily preclude an arrestee from recovering damages on a § 1983 excessive force claim. *Garrison v. Porch*, 376 F. App'x 274, 277 (3d Cir. 2010) (not published) (citing *Nelson v. Jashurek*, 109 F.3d 142, 145-46 (3d Cir. 1997)). Nor does the fact that plaintiff was found guilty of causing Leo's rifle to discharge automatically entitle Leo to qualified immunity.[9] *See Id.* (An admission of assaulting an officer does not address whether any forced used to effectuate the arrest was excessive.); *Domitrovich v. Monaca*, Civ. No. 08-1084, 2010 WL 3489137, at *9 (W.D. Pa. Sept. 1, 2010) (defendant was convicted of resisting arrest, but officer's conduct during the course of the encounter had no bearing on the operative facts necessary to establish guilt of defendant and did not estop defendant from pursuing an excessive force claim).

Because the determination of whether the use of force is reasonable is a fact specific inquiry, courts have reached different results depending upon the facts and circumstances of each case. *See Bender v. Township of Monroe*, 289 F. App'x 526 (3d Cir. 2008) (not reported) (genuine issues of material fact precluded summary judgment on whether police officers retaliated and used excessive force against an arrestee by beating him while handcuffed, hitting him in the face with a flashlight, and breaking his cheekbone, because arrestee had kicked an officer); *Davis v. Bishop*, 245 F. App'x 132 (3d Cir. 2007) (not published) (no excessive force by police officers in handcuffing and subduing arrestee who was intoxicated, disobeyed officer's orders to attempt to perform

---

[9] It was not determined that plaintiff pulled the trigger. The appellate court found that whether plaintiff pulled the trigger was immaterial where a firearm was discharged as a direct result of a violent attempt to take the firearm from an officer. *United States v. Lora-Pena*, 375 F. App'x 242, 247 (3d Cir. 2010) (not published).

a field sobriety test and get off the hood of the police car, and eventually kicked out the rear window of the police cruiser, and although officer admitted to having flung arrestee off the car, officers were confronted with an uncertain situation with an individual who was uncooperative); *Feldman v. Community Coll. of Allegheny*, 85 F. App'x 821 (3d Cir. 2004) (not published) (no excessive force by police officers when arresting college student even if, as student alleged, the officers wrestled student to the ground and kicked him in the head, when the student resisted arrest and actively struggled with the officers when they attempted to remove him); *Ankele v. Hambrick,* Civ. No. 02-4004, 2003 WL 21223821 (E.D. Pa. May 7, 2003), *aff'd*, 136 F. App'x 551 (3d Cir. 2005) (not published) (show of force of slamming plaintiff onto hood of patrol car reasonable given the uncertainty presented by the arrestee's conduct).

The undisputed facts are that plaintiff had been a fugitive for ten years, he released two pit bulls upon officers when they arrived at the front door to arrest him, he ran from officers at his front door, he ran from officers at the back door, and only stopped when he either ran into Leo or was grabbed by Leo.[10] Leo does not deny striking plaintiff's face with his head. Although Leo's actions in headbutting plaintiff may have been unnecessary, he was confronted with an uncertain situation with a fugitive of many years, who ran from law enforcement officers no matter where they were stationed around the house, he knew there were pit bulls in the house, and both his hands were occupied (one holding onto plaintiff and the other protecting his weapon).

---

[10]Plaintiff provided conflicting testimony on the issue of whether he knew the individuals at the front door were police officers. He is clear, however, that he realized the officers at the back door were U.S. Marshals.

Plaintiff states in his opposition that he was not actively resisting arrest but does concede that he "used his arms to simply protect himself." Finally, it is undisputed that Leo, as well as plaintiff, sustained injuries, albeit Leo's injuries were not as severe as plaintiff's.

Keeping in mind that "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation," the court concludes that Leo used reasonable force to gain control of the situation. *See Graham*, 490 U.S. at 397. Indeed, Leo was confronted with an individual who attempted to flee from arrest, actively resisted arrest, and who had released pit bulls to aid in his attempted escape. A reasonable jury could conclude that the force used was reasonable given the conduct of plaintiff.

For the above reasons, the court finds that any force that may have been applied does not rise to the level of a constitutional violation. Therefore, Leo is entitled to qualified immunity. Moreover, the court will grant defendants' motion for summary judgment as to the excessive force claim.

### C. Failure to Intervene/Protect

Defendants argue that, because summary judgment is appropriate as to the excessive force claim, the failure to intervene/protect claims fails. In addition, they argue summary judgment is appropriate inasmuch as plaintiff testified that Thomas did, in fact, intervene and there is no evidence of personal involvement by the other defendants.

To establish a Fourth Amendment violation for failure to intervene, a plaintiff must establish that: (1) the police officer failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a "realistic and reasonable opportunity to intervene." See *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002); *Fernandez v. Stack*, No. 03-4846(JAP), 2006 WL 777033, at *12 n.8 (D.N.J. Mar. 27, 2006). It is plaintiff's burden to adduce evidence of both requirements. *Gainor v. Douglas County, Ga.*, 59 F. Supp. 2d 1259, 1289 (N.D. Ga. 1998) ("plaintiff must proffer evidence that the officer in question had a reasonable opportunity to intervene.").

Initially the court notes that "[alt]hough legally distinct, the fate of plaintiff's failure to intervene claim is closely linked to that of [the] excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene." *Abdullahi v. City of Madison*, 423 F.3d 763, 767-8 (7th Cir. 2005); *Williams v. Holt*, Civ. No. 02-634, 2006 WL 3741936, at *3 n.2 (E.D. Tenn. Dec. 18, 2006); *Jackson v. Mills*, Civ. No. 96-3751, 1997 WL 570905, at *5 n.10 (E.D. Pa. Sept. 4, 1997). Inasmuch as the court will grant defendants' motion for summary judgment on the issue of excessive force, the failure to intervene/protect necessarily fails.[11]

---

[11] The record reflects that Thomas is entitled to summary judgment on this issue. Plaintiff testified Thomas intervened, pulled Leo off plaintiff, and stopped Leo's actions. Hence, it cannot be said that Thomas failed to intervene or protect plaintiff. As to the remaining defendants, the record does not demonstrate their personal involvement in any alleged constitutional deprivation nor could plaintiff identify any of the other officers present at the time that Thomas intervened. Plaintiff's failure to identify any officers (other than Thomas), or to provide facts to support their personal involvement is fatal to the failure to intervene/protect claim.

Therefore, the court will grant defendants' motion for summary judgment on the failure to intervene/protect issue.

## V. CONCLUSION

For the reasons discussed, the court will grant defendants' motion for summary judgment. (D.I. 74) An appropriate order will be entered.